J-S04005-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.L.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: M.B., FATHER | : | |
| | : | No. 1685 EDA 2021 |

Appeal from the Order Entered July 22, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0003047-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: J.L.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: M.B., FATHER | : | |
| | : | No. 1686 EDA 2021 |

Appeal from the Decree Entered July 22, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000488-2020

BEFORE:   BENDER, P.J.E., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED APRIL 4, 2022**

        M.B. (Father) appeals from the decree and the order, both dated July 21, 2021, and entered on July 22, 2021, that granted the petitions filed by the Philadelphia Department of Human Services (DHS) to involuntarily terminate Father's parental rights and to change the permanency goal from

_____

[*] Former Justice specially assigned to the Superior Court.

reunification to adoption for J.L.B. (Child),[1] born in November of 2009.[2]  After

review, we affirm.

In Father's brief, he sets forth the following issues for our review:

1) Whether the trial court committed reversible error in its determination that presented evidence satisfied the clear and convincing standard to support termination of parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(1), (2), (5), and (8).

2) Whether the trial court committed reversible error when it determined that there was sufficient evidence exhibited to rise to the level of clear and convincing to support the finding that there was an insufficient father-child bond and that changing the goal to adoption would not cause irreparable harm to the child.

3) Whether the trial court committed reversible error when it determined that there was sufficient evidence exhibited to rise to the level of clear and convincing to support the finding that the child could not safely be reunited with her father presently or in the near future, with or without assistance to remedy any dependent issues that may (or may not) exist.

Father's brief at 4.[3]

We review an order terminating parental rights in accordance with the

following standard:

_____

[1] The parental rights of Child's mother, A.M. (Mother), were involuntarily terminated at the same time as Father's rights.  Mother's appeal is addressed in a separate decision.

[2] This Court consolidated Father's two appeals *sua sponte* in that they involved related parties and issues.  *See* Pa.R.A.P. 513.

[3] In his brief, Father indicates that because the trial court had not made any findings relating to Section 2511(a)(1), which counsel had erroneously cited in Father's Pa.R.A.P. 1925(b) statement, that part of the first issue is withdrawn.  Father also withdraws his second issue relating to the goal change for Child.  *See* Father's brief at 8-9.

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that:

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)). The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003).

We have reviewed the certified record, the briefs of the parties, the applicable law, and the extensive and comprehensive opinion authored by the Honorable Allan L. Tereshko of the Court of Common Pleas of Philadelphia County, dated October 8, 2021. We determine that Judge Tereshko's well-

reasoned decision disposes of the issues raised by Father. Specifically, the court notes that DHS became involved with the family in November of 2017, and both J.L.B. and her younger sister S.M. were placed in a foster home. A parent locator search was issued at that time as to Father, M.B., but he did not have contact with DHS until June of 2019. Judge Tereshko's opinion provides the following as to his reasons for terminating Father's parental rights to J.L.B.:

> This [c]ourt finds that DHS has provided clear and convincing evidence to satisfy the requirements to terminate Father's parental rights. Father has abandoned this Child and has never been a caretaker nor has he ever parented this Child. Father has complied with parenting class and has allowed a [c]ounty agency to perform a home assessment in Mississippi, where he resides. He had three therapy sessions with the Child. Father has never stated to this [c]ourt that he is ready, willing and able to parent this Child. In fact, Father stated it would be inappropriate for this [c]ourt to send his daughter to live with him. Father wants the [c]ourt to continue the Child in foster care and continue therapy with the hope that someday he will be able to become her parent. This Child's life cannot be placed on hold until Father perhaps acquires the necessary parenting skills required to provide a caring and safe environment or until he develops a parent-child bond with her.

Trial Court Opinion, 11/8/2021, at 24.

Because we conclude that Judge Tereshko's opinion disposes of the issues raised by Father, we adopt Judge Tereshko's opinion as our own, and affirm the decree and order appealed from on that basis.

Decree and order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/4/2022

THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA, PHILADELPHIA COUNTY
IN THE COURT OF COMMON PLEAS    2021 OCT -3 AM II: 18

IN THE INTEREST OF:        : FAMILY COURT DIVISION
                           : JUVENILE BRANCH-Dependency
                           :
J.L.B., a Minor            : CP-51-DP-0003047-2017
d/o/b: 11/●/2009           : CP-51-AP-0000488-2020
                           :
                           : Superior Court Nos.:
Appeal of:                 : 1685 EDA 2021; 1686 EDA 2021
M.B., Father               :
                           : CONSOLIDATED[1]


## O P I N I O N


M.B. ("Father"), Appeals from the Decree of Involuntary Termination of Parental

Rights and Goal Change to Adoption entered by this Court on July 21, 2021, granting the

Petitions to Involuntarily Terminate his Parental Rights to the above-referenced Child,

filed by the Department of Human Services ("DHS") on December 31, 2020. Father also

appeals this Court's granting the Petitions for Goal Change also filed on December 31,

2020. In response to these Orders, Father, by and through his counsel filed Notices of

Appeal with Statement of Errors Complained of on Appeal on August 19, 2021.

The parental rights of Mother, A.M., were involuntarily terminated as to J.L.B. on

July 21, 2021 and Mother filed Appeals on August 20, 2021 at 1696 and 1697 EDA

2021. Mother's Appeals are addressed in a separate Opinion.

---

[1] 9/24/2021. Consolidated Sua Sponte. Comment: Review of these matters indicates that these appeals
involve related parties and issues. Accordingly, the appeals at Nos. 1685 and 1686 EDA 2021 are hereby
CONSOLIDATED. See Pa.R.A.P. 513.

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

In his Statement of Matter Complained of on Appeal, Father raises the following issues:

1. The trial court made reversible error in its determination that presented evidence satisfied the clear and convincing standard to support termination of parental rights pursuant to 23 Pa.C.S. A. §§2511(a),(1),(2),(5), and (8).
2. The trial court committed reversible error when it determined that there was sufficient evidence exhibited to rise to the level of clear and convincing to support the finding that there was insufficient father-child bond and that changing the goal to adoption would not cause irreparable harm to the child.
3. The trial court committed reversible error when it determined that there was sufficient evidence exhibited to rise to the level of clear and convincing to support the finding that the child could not safely be reunified with her father presently or in the near future, with or without assistance to remedy any dependent issues that may (or may not) exist.

## PROCEDURAL HISTORY:

A.M. (thereafter, "Mother") gave birth to daughter, J.L.B. on November ●, 2009. M.B. (thereafter, "M.B.") is listed as Father on the Birth Certificate. (Exhibit "B" *Certification of Live Birth,* attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020).

A.M. (thereafter, "Mother") gave birth to daughter, S.M. on November ●, 2017. R.M. (thereafter, "R.M.") is listed as Father on the birth certificate. (Exhibit "B" *Certification of Birth,* attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020).

On October 31, 2017, DHS received a General Protective Services (GPS) Report alleging that on October 31, 2017, Child, J.L.B., was referred by school staff to

2

Children's Hospital of Philadelphia (CHOP) because she was limping and in pain; that J.L.B. was diagnosed with recent extensive bruising and old linear hyperpigmentation on the backs of her legs; that the Children's Mother, A.M., told CHOP staff that, since around October 24, 2017, J.L.B. had jumped on a glass table with other children from church, had been hit repeatedly with a bat by another child, and fallen down steps; that S.M.'s Father, R.M., Stepfather to J.L.B., arrived at CHOP after Mother and J.L.B. had arrived; that Stepfather, R.M. was verbally aggressive with CHOP staff; that Mother and R.M., disagreed regarding J.L.B. jumping on the glass table and being hit with a bat by the unidentified child; that R.M. became enraged in the treatment room, repeatedly listing his various accomplishments that led to the decision to remove the child that was hitting J.L.B. from the church; that he stated "I am a man of God"; that he repeatedly requested a more intensive treatment plan for J.L.B.; that he appeared unable to understand what CHOP staff was attempting to explain to him; that he was further angered at the discussion of J.L.B.'s safety while in the home; that R.M. failed to calm himself and stated he would be taking J.L.B. to her primary care physician; that R.M. threatened legal action before leaving the treatment room; that R.M. stated that he would return in ten minutes if Mother was not outside within that time, insinuating that he would exhibit further explosive behavior; that CHOP staff contacted the primary care physician listed for J.L.B. and was informed that the family does not go there for treatment; that Mother appeared amenable to listening to CHOP's future treatment plan for J.L.B.; and that R.M. removed J.L.B. from CHOP against medical advice (AMA). This Report was determined as valid. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "a").

3

On November 1, 2017, DHS went to the family's home, but no one appeared to be at home. DHS left a letter requesting that Mother and Stepfather, R.M. contact DHS. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020. ¶ "b").

On November 1, 2017, DHS telephoned R.M., who was extremely hostile during the telephone call. He told DHS that the Agency has no authority to investigate the safety of J.L.B. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/31/2020. ¶ "c").

On November 2, 2017, DHS went to the family's home. DHS met with Mother and Stepfather, R.M. outside the home. DHS observed that he stopped Mother from talking, stating that she should not be talking because she is pregnant. He refused to allow DHS to have access to the home. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020. ¶ "d").

On November 3, 2017, Community Legal Services (CLS) telephoned DHS and stated that Mother and R.M., had attempted to retain CLS services as legal counsel; that CLS had explained the DHS investigation process to them and they were now willing to cooperate with DHS' investigation. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020. ¶ "e").

On November 3, 2017, DHS telephoned R.M., who agreed to a home visit on November 6, 2017. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "f").

On November 6, 2017, DHS went to J.L.B.'s school and met with her, who told DHS that on October 31, 2017, she was limping and in pain when she arrived at school

4

because while she was at church, a three-year-old child had hit her on her leg with a bat and because she had fallen down stairs on October 31, 2017; that Mother did not stop the child from hitting her with the bat; and that Stepfather, R.M. has a history of hitting her on her legs with drumsticks when she fails to do her chores. DHS observed a bruise and linear marks on the backs of her legs. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "g").

On November 6, 2017, DHS went to the family's home and met with R.M., who stated that on October 31, 2017, he had taken J.L.B. from CHOP against medical advice because he felt that he was being discriminated against by CHOP staff and that he took J.L.B. for a medical examination with her primary care physician at Delaware Valley Community Center on November 1, 2017. He denied hitting J.L.B. and told DHS that there were no drumsticks in the house. DHS met with J.L.B., who again stated that R.M., has a history of hitting her with drumsticks and that he had two sets of drumsticks, one in the home and one at the church. DHS observed a set of drumsticks in the dining room of the home. R.M. again denied hitting J.L.B. and stated that she has a history of not telling the truth and that he was no longer willing to be involved in her care. DHS met with Mother, who told DHS that she is the primary disciplinarian for J.L.B. and denied that R.M. had ever hit J.L.B. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "h").

On November 10, 2017, the October 31, 2017 GPS Report was upgraded to a Child Protective Services (CPS) Report. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "i").

5

On November 13, 2017, Mother gave birth to daughter S.M. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "j").

On November 14, 2017, DHS learned that J.L.B. went to school that day and had a bruise on her left cheek. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "k").

On November 14, 2017, DHS went to J.L.B.'s school and met with her. DHS observed a bruise on J.L.B.'s left cheek. She stated that Stepfather, R.M. had hit her with his hand because she was misbehaving in the backseat of the family's automobile and that he had told her to tell DHS that no one had hit her. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "l").

DHS obtained an OPC for J.L.B. and S.M. on November 14, 2017. They were placed in a foster home through Children's Home of Easton (CHOE). (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "m").

On November 14, 2017, Mother telephoned DHS and stated that the mark on J.L.B.'s face could have been caused when she was playing with her hair dryer or curling iron. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "n").

On November 14, 2017, DHS went to the family's home and met with Mother who told DHS that J.L.B.'s face may have been bruised while she slept; that Mother was not at home when she sustained the bruise; that on 11/13/2017, R.M. and J.L.B. had

6

visited her in the hospital; that J.L.B. told Mother that she did not know how she had been bruised; and that R.M. told Mother that he did not notice any mark on J.L.B.'s face. During the DHS visit. R.M. became irate and verbally abusive to DHS and stated that he did not believe that J.L.B. had told DHS that he had hit her. (Exhibit "A" Statement of Facts. attached to DHS Petition For Involuntary Termination of Parental Rights. filed 12/31/2020. ¶ "o").

On November 15. 2017. J.L.B.'s school telephoned DHS and stated that on 11/14/2017. R.M. had arrived at the school to retrieve J.L.B. after DHS had left and that R.M. told the school staff that the mark on J.L.B.'s cheek was a birthmark. (Exhibit "A" Statement of Facts. attached to DHS Petition For Involuntary Termination of Parental Rights. filed 12/31/2020, ¶ "p").

A Shelter Care Hearing was held on November 16, 2017 before the Honorable Allan L. Tereshko. OPC was lifted and temporary legal custody transferred to DHS and placement in foster care through Children's Home of Easton. DHS to explore family finding. Child, S.M., to have a full Child Abuse evaluation. Both Children safe as of 11/14/2017. (Shelter Care Order. 11/16/2017).

On November 29, 2017. an Adjudicatory Hearing was continued. and a Parent Locator Search (PLS) was ordered on Father, M.B. (Continuance Order, 11/29/2017).

On December 12, 2017, The Community Umbrella Agency (CUA) Turning Points for Children (TP4C) held an Initial Single Case Plan (SCP) meeting. The parental objectives for Mother were: 1) will attend parenting class and learn three non-physical forms of discipline; 2) attend and complete anger management class; 3) attend individual therapy; and 4) maintain contact with children per court order. Both parents appeared and

7

participated in the SCP meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "s").

An Adjudicatory Hearing was held on March 14, 2018 for J.L.B. before the Honorable Allan L. Tereshko. The Child was found to be a Dependent Child. Legal Custody remains with DHS, and placement continues in foster care through Children's Home of Easton. Child found J.L.B. as a victim of child abuse as to Mother and Stepfather, R.M. Reunification efforts must continue. Supervised visits as arranged, and parents are to have an additional 4 hours for visits. Child receives therapy through Children's Home of Easton. Mother and Stepfather, R.M., referred to BHS for consultations and/or evaluations. Motion is granted allowing J.L.B.'s out of court statements to be admitted. Individual therapy to continue for the child and family therapy incorporated when therapist deems appropriate. Mother and Stepfather referred to ARC for parenting. (Order of Adjudication and Disposition. 3/14/2018).

On April 19, 2018, the Court ordered Mother and R.M., to receive forthwith Parenting Capacity Evaluations (PCE). (Continuance Order, 4/19/2018).

On May 8, 2018, hearing continued to allow parents to hire new counsel because they do not wish to continue being represented by current counsel. DHS to work with parents for visitation in accordance with work schedule. Both J.L.B. and S.M. are safe as of 4/18/2018. (Status Review Order, 5/08/2018) (Continuance Order, 5/08/2018).

On June 21, 2018, CUA-TP4c held a revised SCP meeting. The parental objectives for Mother and R.M. were: 1) will attend parenting class and learn three non-physical forms of discipline; 2) attend and complete anger management class; 3) attend individual therapy; and 4) maintain contact with children per court order. 5) complete

8

court ordered BHS evaluation and follow all recommendations: and 6) complete court ordered Parenting Capacity Evaluation (PCE) and follow all recommendations. Both Mother and R.M. appeared and participated in the SCP meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "z").

A Permanency Review Hearing for J.L.B. was held on June 27, 2018, before the Honorable Allan L. Tereshko. Legal custody remains with DHS, and placement remains in foster care through Children's Home of Easton (CHOE). Mother to have supervised visits at Agency and stepfather, R.M. is not to be in the building when Mother is visiting with Child. Mother's home is appropriate and Mother attends ARC for parenting. CUA has no contact with J.L.B.'s Father, M.B. Mother referred for PCE. Family Therapy to be implemented when appropriate and Father to be included when appropriate. Mother has private counsel. Child safe as of 6/14·2018. (Permanency Review Order, 6/27/ 2018).

On September 20, 2018, CUA-TP4C held a revised SCP meeting. The parental objectives for Mother and R.M. were: 1) maintain contact with children per court order: 2) complete court ordered PCE and follow all recommendations: and 3) participate in family therapy when appropriate. Both parents appeared and participated in the SCP meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "cc").

On September 26, 2018, a permanency review hearing was held for J.L.B before the Honorable Allan L. Tereshko. Legal custody remains with DHS and placement continues in foster care through C.H.O.E. J.L.B. was recently moved to new foster care

9

home. She receives trauma-based therapy and attends 3rd grade. IEP scheduled for 10/15/2018. Mother has weekly supervised visits with the Child at the Agency. Mother's last visit was July 2018. Stepfather, R.M., is NOT permitted to accompany Mother during her and Child's supervised visits. Mother is scheduled for PCE on 10/23/2018. All services for the Child are to continue. Mother to comply with the Child's therapist recommendations regarding beginning Family Therapy. Mother and R.M. are scheduled for PCE for 10/23/2018. They are to comply with PCE, which is expedited. PCE is to examine the capacity of both siblings in a separate light. S.M. to be moved to the foster care home with her sibling, and all parties notified. Both Children safe as of 9/12/2018. (Permanency Review Order, 9/26/2018).

On December 20, 2018, CUA-TP4C held a revised SCP meeting. The parental objectives for Mother and R.M. remained the same as the objectives given at the September 20, 2018 SCP meeting. Both attended and participated in the SCP meeting by telephone. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "ff").

On March 12, 2019, Permanency Review Hearing were held for both Children. Legal custody remains with DHS and placement continues in foster care at C.H.O.E. J.L.B. is up to date with medical, dental and receiving therapeutic services. Mother to have weekly supervised visits with Child at Agency. Therapist, Marybeth Younger is permitted to testify telephonically next court date. No changes to Child's therapy. PLS search for Child's Father. M.B. Children safe as of 2/14/2019. Parents hired new counsel. (Permanency Review Order, 3/12/2019).

10

On May 8, 2019, Permanency Review Hearings were held for both Children before the Honorable Allan L. Tereshko. Legal custody remains with DHS, and placements continues in foster care. Mother's visits with both Children shall be modified to every other week supervised by a visitation coach provided to C.H.O.E. CUA to explore placement of siblings together. Current therapist for J.L.B. to remain. ACS to subpoena visitation coach for next court listing. Children safe as of 4/11/2019. (Permanency Review Hearing Order, 5/08/2019).

On June 10, 2019, CUA-TP4C held a revised SCP meeting. The parental objectives for Mother remained the same as the objectives given at the September 20, 2018 SCP meeting. Parental objectives were not established for M.B., J.L.B.'s Father, because his whereabouts were unknown. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020. ¶ "jj").

On or about June 13, 2019, M.B., J.L.B.'s Father availed himself to CUA. CUA told M.B. that he would need to take parenting classes, remain in contact with CUA, submit a current lease/proof of residency, submit pay stubs and develop a bond with the Child, when appropriate. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020. ¶ "ll").

On August 28, 2019, Permanency Review Hearings were held for both Children before the Honorable Allan L. Tereshko. Legal custody remains with DHS, and placement continues in foster care. Visitation for Children with Mother to remain as status quo. Therapist report dated 8/27/2019. Mother and R.M. to resubmit for a PCE, for it to be expedited, and it to include Minnesota Multiphasic Personality Inventory. Mother to produce an original divorce decree as to M.B. Therapist for J.L.B. to appear in

11

person or by phone at next court listing. Father, M.B., participated by telephone. Children safe as of 8/14/2019. (Permanency Review Order. 8/28/2019).

On November 20, 2019, Permanency Review Hearings were held for both Children before the Honorable Allan L. Tereshko. Legal custody remains with DHS, and placement continues in foster care through C.H.O.E. Visitation for Children with Mother to remain as bi-weekly supervised visits at Agency. J.L.B. is attending Williams Township Elementary School and has an IEP. She and receiving individual therapy, however, family therapy was in place but has ceased. CUA to follow up with the Child's therapist regarding contact with M.B., her Father. She is receiving tutoring services on a weekly basis. She is up to date with medical. PCE for Mother has not been scheduled as additional information is needed. Mother is not attending individual therapy at this time. Mother was recently arrested on 10/10/2019. Mother is currently employed by Signa Group Insurance. Both Children safe as of 11/15/2019. (Permanency Review Order, 11/20/2019).

On January 22, 2020, Permanency Review Hearings were held for both Children before the Honorable Allan L. Tereshko. Legal custody remained with DHS, and placement continued in foster care through C.H.O.E. Visitation by Mother with the child may be modified by agreement of the parties prior to next court date. Mother's addendum to PCE completed 1/15/2020. CUA to explore family resources as identified today. (Permanency Review Order—Amended, 1/22/2020).

On September 3, 2020, Permanency Review Hearings were held for both Children before the Honorable Allan L. Tereshko. Legal custody remains with DHS, and placement continues in foster care through C.H.O.E. J.L.B. is 10 years old and doing

well in the home. She is enrolled at Williams Township Elementary School, her IEP is up to date, and her educational needs are being met. She is up to date with medical and dental and receives therapy. Mother to have on-site supervised visits with the Children, supervised by CHOE staff. Visits with Mother can be modified by agreement of the parties. CUA to make releases available for Mother's signature and therapist to provide treatment plan, progress report and attendance within 30 days. CUA to reach out to J.L.B.'s therapist, and CUA to assign SCP goals for her Father, M.B. Father to have virtual supervised visits with J.L.B. supervised by her therapist and at therapist's recommendation. County of jurisdiction to do complementary home evaluation of Father's residence. Court administration to appoint legal counsel for J.L.B. Child safe as of 9/01/2020. (Permanency Review Order, 9/03/2020).

On January 20, 2021, Permanency Review Hearings were held for both Children before the Honorable Allan L. Tereshko. Legal custody remains with DHS, and placement continues in foster care through New Foundation. All prior orders as to parents to stand. Children safe as of 1/14/2021. (Permanency Review Order, 1/20/2021).

On April 22, 2021, a Permanency Review Hearing was held for both Children before the Honorable Allan L. Tereshko. Legal custody remains with DHS, and J.L.B.'s placement shall remain in a Pre-Adoptive Home through CHOE. Children to remain as committed. All attorneys to submit their closing arguments in writing to the Judge within 30 days and to be emailed to the Court. The cases are held under advisement and Court will render decision. Child safe as of 4/21/2021. (Permanency Review Order, 4/22/2021).

## STANDARD OF REVIEW AND LEGAL ANALYSIS

When reviewing an appeal from a decree terminating parental rights, an appellate court is limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, an appellate court must accord the hearing judge's decision the same deference that it would give to a jury verdict. The Pennsylvania Superior Court need only agree with a trial court's decision as to any one subsection under 23 P.C.S.A. §2511 (a) in order to affirm a termination of parental rights. *In re D.A.T. 91 A.3d 197 Pa.Super.2014)*.

The standard of review in termination of parental rights cases requires appellate Courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. In re T.S.M., 620 Pa. 602, 71 A.3d 251, 267 (2013) (citations and quotation marks omitted) In re Adoption of C.D.R., 2015 PA Super 54, 111 A.3d 1212, 1215 (2015).

14

## The Trial Court Properly Found that DHS had met its Burden by Clear and Convincing Evidence to Involuntarily Terminate Father's Parental Rights Pursuant to 23 Pa.C.S.A. §2511 (a)(2), (5) (8) and 2511 (b) [2]

Involuntary termination of parental rights is governed by § 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938. As the party petitioning for termination of parental rights, DHS "must prove the statutory criteria for that termination by at least clear and convincing evidence." *In re T.R.*, 465 A.2d 642, 644 (Pa. 1983). Clear and convincing evidence is defined as "testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of Sylvester*, 555 A.2d 1202, 1203-04 (Pa.1989).

Termination of parental rights is governed by Section 2511 of the Adoption Act 23 Pa.C.S.A. §§ 2101–2938, which requires a bifurcated analysis. Initially, the focus is

---

[2] **23 Pa.C.S.A. §2511 (a) General Rule.**—the rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds: (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parenting claim to a child or has refused or failed to perform parental duties. (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. (5) The child has been removed from the care of the parents by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child. (8) The child has been removed from the care of the parent by the court or under voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of the parental rights would best serve the needs and welfare of the child.

**23 Pa.C.S.A. §2511 (b). Other Considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1),(6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

15

on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond. *In re L.M.,* 923 A.2d 505, 511 (Pa.Super.2007) (citations omitted). In re Adoption of C.J.J.P., 2015 PA Super 80, 114 A.3d 1046, 1049-50 (2015). The Court need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. In re Adoption of C.J.J.P., 2015 PA Super 80, 114 A.3d 1046, 1050 (2015).

Father alleges this Court committed reversible error when it involuntarily terminated his parental rights where such determination was not supported by clear and convincing evidence under 23 Pa.C.S.A. §§2511 (a) (1), (2), (5), (8) and 2511 (b). This Court disagrees.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b):

16

determination of the needs and welfare of the child under the standard of best interests of the child.

DHS became aware of J.L.B. on October 31, 2017, when it received a General Protective Services (GPS) Report alleging that on October 31, 2017, seven year old J.L.B., was referred by school staff to Children's Hospital of Philadelphia (CHOP) because she was limping and in pain and she told them R.M., hits her on her legs with drumsticks when she fails to do her chores. DHS observed a bruise and linear marks on the backs of her legs. J.L.B. was diagnosed with recent extensive bruising and old linear hyperpigmentation on the backs of her legs; the Children's Mother, A.M., told CHOP staff that, since around October 24, 2017, J.L.B. had jumped on a glass table with other children from church, had been hit repeatedly with a bat by another child, and fallen down steps. (CPS Report, 10/31/2017, Exhibit DHS 4).

On November 15, 2017, DHS obtained an Order of Protective Custody (OPC) for J.L.B. and removed her from the home of her Mother and Stepfather, R.M. On December 26, 2017, DHS indicated the Child Protection Services (CPS) Report naming Mother and R.M. as perpetrators of abuse for causing bodily injury to a child through a recent act or failure to act (Exhibit DHS-4).

On November 16, 2017, this Court transferred legal custody of both J.L.B. and S.M. to DHS and placed them in foster care through Children's Home of Easton. (Shelter Care Orders, 11/16/2017).

On March 14, 2018 this Court adjudicated J.L.B. Dependent and found her to be the victim of child abuse as defined by 23 Pa.C.S. §6303 and the perpetrators were found to be Mother and Stepfather, R.M. (Order of Adjudication and Disposition, 3/14/2018).

17

On January 20, 2021, this Court held the first of two hearings to consider the DHS petitions filed December 31, 2020 to involuntarily terminate the parental rights and change the goals of Children to adoption.

This Court also heard persuasive. credible testimony from Nicole Beauchamp. foster care worker from Children's Home of Easton (CHOE). She stated she is the liaison for children that are in foster care as well as for the foster families. the agency and the biological families. She began working with J.L.B. and S.M. and the families in September 2018. (N.T.. 1/20/2021, p.26 at 17-25, p.27 at 1-21).

Ms. Beauchamp further testified she has observed the interaction between the two Children and their current foster care parents. She noted that the relationship is very positive. J.L.B. expressed to her that she likes living with the foster parents very much and they are willing to adopt the two girls. She feels they love her very much and are a good support system for her. She gets along well with her three foster siblings and feels safe there. The two sisters, J.L.B. and S.M. are very attached to each other and have spent most of the time together. J.L.B. has expressed she does not want to be separated from her sister under no circumstances. (N.T.. 1/20/2021. p.44 at 7-25, p.45 at 1-25. p. 46 at 1-11).

Ms. Beauchamp testified she last spoke to the Child on 4/19/2021 and asked her if she would be open to having phone calls with her Father. at her discretion. and she stated she was not interested in that at this time. She has asked the Child the same question once a month since the hearing in January 2021 and her answer has been the same. She opined the Child would not suffer irreparable harm if Father's parental rights were

terminated and it would be in her best interests to be freed for adoption with the Days. (N.T.. 4/22/2021. p.290 at 2-25. p.292 at 9-19).

Amber Walsh. therapist at CONCERN Behavioral Health testified she began working with J.L.B. as her direct clinical therapist on August 15. 2020. She meets with the Child every Monday at her school on a weekly basis and sometimes meets with her biweekly on Thursdays at the office. Ms. Walsh testified she works with the Child on advocating for herself. emotional regulation and processing through trauma. (N.T.. 1/20/2021, p.58 at 22-25. p.59 at 1-25. p.60 at 1-21).

Ms. Walsh testified that regarding J.L.B.'s relationship with her Father, a conversation took place on 1/11/2021 and the Child stated she does not have any memory of her Father and was unsure of his first name. Ms. Walsh testified she had two phone conversations with Father and discussed family therapy, and the process of the therapy. She noted that the Child told her she did not want to engage in family therapy with her Father. (N.T.. 1/20/2021. p.66 at 9-25. p.67 at 1-15. p.101 at 11-25. p.102 at 1-25. p.103 at 1-8).

On cross-examination by Elizabeth Flanagan, Esquire, Child Advocate/GAL, Ms. Walsh testified that her recommendation was that family therapy between the Child and her Father would be inappropriate at this time. The fact that there was previous contact and sessions between them in the past would not change her recommendation. (N.T.. 1/20/2021. p.74 at 9-16).

Ms. Walsh testified again at the April 22. 2021 hearing. and she testified that since the last hearing she spoke to Father once on 3/18/2021. when he messaged her. and she responded. She advised Father that she could write a progress report summarizing

19

how J.L.B. is doing if he requested it and advised him that family therapy was still not being considered because the Child did not want it. (N.T., 4/22/2021, p.29 at 3-25, p.30 at 1-18).

This Court also heard credible, persuasive testimony from Patrice Garvey, CUA Case Manager Supervisor, Turning Points for Children, CUA9 and has worked on this case since February of 2018. She testified Father telephoned her on 6/13/2019 after R.M. provided him with her phone number. Father told her he had not been able to contact the family and his daughter for over three years. She informed Father of his FSP objectives which were to maintain appropriate housing, provide information on employment, attend parenting class and to follow the visitation court order, and also to provide a copy of documents showing his divorce from Mother. (N.T., 1/20/2021, p.119 at 13-25, p.120 at 1-8, p.121 at 3-25, p.122 at 1-11, p.123 at 1-25, p.124 at 1-25, p.125 at 1-2).

Ms. Garvey stated Father provided her with his address and provided her with verification that he had completed a parenting class in Mississippi in January 2020. Father did not provide employment information except to say he was working as a roofer under the table for cash. She testified Father is currently living in his family trailer home. She noted Father contacts her at least once every two months and that she sends him copies of paperwork that relates to J.L.B. She testified CUA made outreach to the Agency in Mississippi to request they perform a courtesy visit to Father's residence. She received information on 1/15/2021 confirming a visit had occurred and in their view the home was appropriate. (N.T., 1/20/2021, p.125 at 6-25, p.126 1-25, p.128 at 3-15, p.130 at 20-25, p.131 at 1-23).

Ms. Garvey testified she had a conversation with J.L.B. on 1/14/2021 during a virtual visit and asked the Child whether she had stated to her Father that she wanted to live with him, and the Child denied saying that and denied she wanted to live with him. When asked whether she wanted to maintain a relationship with her Father, and if she knew who he was, the Child responded that she did not really know who he was, and that she did not want a relationship with him. She stated she wanted to remain with the Days, her foster parents. Ms. Garvey stated since Father made contact with her in June of 2019, he has never attempted to visit the Child in Philadelphia, has never inquired about the Child's over all wellbeing, has never inquired about the Child's education, nor her mental wellbeing. Ms. Garvey opined the Child would not suffer irreparable harm if Father's parental rights were terminated and it would be in the Child's best interest to be adopted. (N.T., 1/20/2021, p.133 at 12-25, p.134 at 1-25, p.135 at 1-25, p.136 at 1-8, p.246 at 6-18).

Maribeth Younger, a private mental health therapist also testified before this Court. She was therapist for J.L.B. beginning in July 2018 when the Child's Mother made the arrangements through her personal insurance. She noted that although Mother lost her insurance coverage, she continued with the therapy sessions with the Child. She described the Child as a delightful young lady who disclosed a lot of sensitive information to her. She noted that she wanted to make sure the Child has a support system as she was transitioning through the foster care system and that is why she continued to provide services. (N.T. 4/22/2021, p.122 at 21-25, p.123 at 1-25, p.124 at 1-5, p.127 at 1-13).

21

Ms. Younger testified that Father called her in January of 2020, and she asked him to write a letter to his daughter and forward it to her and she asked him for his legal history. She stated Father complied and she contacted Ms. Flanagan, Child Advocate, to make sure it was legitimate for Father to make contact with the Child. She testified there were at least 3 virtual sessions between Father and Child between January of 2020 until March 2020 when the Pandemic hit. She noted that at first the Child was nervous with the interaction and she did ask him many questions how old he was and if he had other children. She testified she never recommended to CUA that Father begin having more expanded visitation beyond the sessions with her, although she did tell the foster mother about it. Ms. Walsh noted her last session with the Child was 8/28/2020 and she was never contacted by anyone at CHOE for progress notes or documentation. She stated she was contacted in January 2021 and asked to provide a summary of her therapy with the Child. She noted that although she attempted to arrange a final session with the Child to say goodbye it unfortunately never happened. Ms. Younger testified she did not reach out to the CUA case manager or supervisor to facilitate another session between Father and the Child. She did not reach out to Ms. Beauchamp at CHOE. She noted that she refused to have a conference call with Ms. Flanagan, with Ms. Schiffman, DHS attorney and deputy city solicitor based on reasons that were not related to the case but related to an allegation that Mother had made. (N.T. 4/22/2021, p.128 at 13-25, pp.129- 132 at 1-25, p.133 at 1-9, p.150 at 14-18, p.153 at 10-25, p.158 at 11-20, p.160 at 10-25, p.161 at 1-10).

Father testified he lives at 252 Cherry Road in Mississippi and County representatives did an inspection of his home back in January of 2021. He lives there

22

with his Grandmother. He stated he was contacted by R.M. in 2019 and given the details of his daughter and he then contacted Ms. Younger, the therapist. He stated prior to R.M. contacting him, he last had contact with the Mother around 2015 and she sent him pictures and videos of the Child. Father acknowledged that he spoke to Ms. Garvey in June of 2019 and he was told he needed to complete certain requirements to have contact with his daughter, such as parenting class and approval from the therapist. (N.T.4/22/2021, p.407 at 15-25, pp.408-409 at 1-25, p.411 at 1-22).

Father testified he completed parenting in September 2020, and he stated he was never asked to provide proof of his divorce from the Child's Mother. He stated he was never served with divorce papers and Mother told him she married some other guy. Father stated he had 3 sessions with his daughter with Ms. Younger. He did not know or understand why the sessions stopped and he stated he contacted the CUA but could not explain how or with whom he spoke. He further testified he spoke to Ms. Garvey who indicated to him that he was accomplishing his goals for reunification. Father stated it took him a while to contact the Child's new therapist, Ms. Walsh, because he did not have her contact information. He stated Ms. Walsh told him that his Child was not interested in family therapy or sessions with him because it was up to her and she did not want to. (N.T. 4/22/2021, p.413 at 3-25, pp.414-415 at 1-25, p.416 at 1-13, p.417 at 1-22, p.419 at 7-24, p.420 at 1-4).

Father stated although he wants to build his relationship with his daughter, it would be inappropriate for the Court to send her to live with him in Mississippi at this time. He stated it would be something they would have to work on. He stated he is currently employed as a mechanic and is working legitimately. He would like to

23

continue therapy sessions with his daughter. (N.T. 4/22/2021, p.420 at 17-25, p.421 at 1-21).

This Court finds that DHS has provided clear and convincing evidence to satisfy the requirements to terminate Father's parental rights. Father has abandoned this Child and has never been a caretaker nor has he ever parented this Child. Father has complied with parenting class and has allowed a County agency to perform a home assessment in Mississippi, where he resides. He had three therapy sessions with the Child. Father has never stated to this Court that he is ready, willing and able to parent this Child. In fact, Father stated it would be inappropriate for this Court to send his daughter to live with him. Father wants the Court to continue the Child in foster care and continue therapy with the hope that someday he will be able to become her parent. This Child's life cannot be placed on hold until Father perhaps acquires the necessary parenting skills required to provide a caring and safe environment or until he develops a parent-child bond with her.

Therefore, this Court finds that there was sufficient evidence presented that no parent-child bond exists between Child and Father, and therefore this relationship should not be preserved. This Court believes the termination of Father's parental rights would best serve the needs and welfare of this Child. The evidence shows that DHS met its burden by clear and convincing evidence to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S.A. §2511 (a)(2), (5) (8) and 2511 (b).

**Trial Court Properly Found that the Goal Change from Return to Parent to Adoption was in the Child's Best Interest and the Court's Disposition was Best Suited to the Safety, Protection and Physical, Mental and Moral Welfare of the Child Pursuant to 42 Pa.C.S.A. §6351 (f.1) (2).[3]**

The concept of a "goal change" is consistent with the statute which requires the trial court, at the conclusion of a permanency hearing in a child dependency proceeding, to order the continuation, modification, or termination of placement or other disposition which is best suited to the safety, protection and physical, mental, and moral welfare of the child: an order to continue, modify, or terminate the current placement, as required by the statute, is synonymous with a decision to continue or change the permanency plan goal. 42 Pa.C.S.A. § 6351(g).

This Court heard credible, persuasive testimony from Ms. Beauchamp who testified she has observed the interaction between the two Children and their current foster care parents. She noted that the relationship is very positive. J.L.B. expressed to her that she likes living with the foster parents very much and they are willing to adopt the two girls. She feels they love her very much and are a good support system for her. She gets along well with her three foster siblings and feels safe there. The two sisters, J.L.B. and S.M. are very attached to each other and have spent most of the time together. J.L.B. has expressed she does not want to be separated from her sister under no circumstances. (N.T., 1/20/2021, p.44 at 7-25, p.45 at 1-25, p.46 at 1-11).

Ms. Garvey testified J.L.B. was placed with the Days, the current pre-adoptive family on 6/21/2019. On or about January 2020, the Child told her she wanted to remain

---

[3] 42 Pa.C.S.A. §6351-Disposition of dependent Child.—(f.1). Additional determinations. Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following: (2) If and when the Child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the Child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the Child.

_foster parents_

with the ████ because she felt safe and wanted to be adopted by them. The Child stated she did not want to go back home to her Mother because she did not feel safe because her Mother did not stop the beatings. (N.T., 4/22/2021, p.232 at 13-25, p.233 at 1-25, p.234 at 1-16).

This Court heard credible, persuasive testimony from Melanie Silverstein, Esquire, TPR Counsel for J.L.B., who is almost 12 years old. Ms. Silverstein had two conferences with the Child on 1/07/2021 and 4/19/2021, and her requests both times remained the same: to remain living with her sister in a safe house and that it would be with her foster parents ████████. She further testified the Child did not want to testify in the courtroom because she did not want to talk in front of her parents. Ultimately, her position is that she wants to stay where she is, even if she doesn't continue to have visits with her Mother or her biological Father. (N. T., 4/22/2021, p.439 at 19-25, p.440-441 at 1-25, p.442 at 1-7).

This Court finds the Record sustains the factual findings and legal conclusions regarding the Child's current placement, and most importantly, the Record demonstrates that Reunification is not feasible and not in this Child's best interest. This Child's life cannot be held in abeyance while Father attempts to attain the skills necessary to parent. Competent, credible, persuasive evidence exists to change the Permanency Goal of the Child from Reunification to Adoption. Adoption has been clearly established as the appropriate goal in the best interest of this Child and is best suited to her safety, protection and physical, mental and moral welfare.

## CONCLUSION

The Court Record shows that J.L.B. was the victim of repeated physical and emotional abuse while in Mother's care and Stepfather's care. Father has never been in the Child's life and has never been a caretaker nor parented this Child. This 11 ½ year old Child has expressed to many individuals unequivocally that she wants to remain with the foster parents, that she feels safe there and wants to be adopted by them. She wants to remain with her sister and feels like the Days are her parents and wants to remain with them.

This Child has been placed in a loving, caring, nurturing home with the pre-adoptive foster family, and this Court believes they deserve the opportunity to experience a loving, caring home where they are protected from harm. Therefore, this Court finds by clear and convincing evidence that DHS has met its burden and Father's parental rights are involuntarily terminated. This Child's life can now move to Adoption.

For the foregoing reasons, this Court respectfully requests that the Decree of Involuntary Termination of Parental Rights of Father, M.B. and the Goal Change to Adoption Order issued by this Court on July 21, 2021, be **AFFIRMED**.

**BY THE COURT:**

_____
**ALLAN L. TERESHKO, Sr. J.**

_Oct 7, 2021_
**DATE**

27